IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

KEVIN BEMBO,
a/k/a KEVIN BEMBOE,
  Petitioner,

vs.        Case No.: 3:15cv194/MCR/EMT

JULIE JONES,
  Respondent.
_____/

## **<u>REPORT AND RECOMMENDATION</u>**

  This cause is before the court on Petitioner's petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (ECF No. 1).  Respondent filed a motion to dismiss the petition as untimely, with relevant portions of the state court record (ECF No. 20). Petitioner responded in opposition to the motion (ECF No. 22).

  The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b). After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned

that the pleadings and attachments before the court show that the habeas petition should be dismissed as untimely.

I.      BACKGROUND AND PROCEDURAL HISTORY

Petitioner challenges the judgment of conviction and sentence entered in the Circuit Court in and for Santa Rosa County, Florida, Case No. 2010-CF-0879 (ECF No. 1 at 1).  The procedural background of that case is established by the state court record submitted by Respondent (ECF No. 20).[1]  Petitioner was charged with one count of burglary of a structure with assault or battery (Count 1) and three counts of sexual battery while wearing a mask (Counts 2, 3, and 4) (Ex. C).  Following a jury trial, Petitioner was found guilty as charged (Exs. D1, D2, D3).  At the conclusion of trial, the court adjudicated Petitioner guilty and imposed a life sentence for the burglary charge, with pre-sentence jail credit of 431 days, and 30 years of imprisonment on each of the sexual battery counts, to run consecutive to each other and consecutive to the life sentence on Count 1 (Ex. D2 at 330–31, Ex. G).  The court also designated Petitioner a sexual predator (Ex. D2 at 332, Ex. F).

Petitioner appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D11-5106 (Exs. H1, H2, H3, H4).  The First DCA affirmed

---

[1] Hereinafter all citations to the state court record refer to the electronically filed exhibits to Respondent's motion to dismiss (ECF No. 20) unless otherwise indicated.  Additionally, if a cited page has more than one page number, the court cites to the "Bates Stamp" page number.

the judgment per curiam without written opinion on December 7, 2012 (Ex. H5). <u>Bemboe v. State</u>, 103 So. 3d 145 (Fla. 1st DCA 2012).  The mandate issued December 27, 2012 (*id.*).

On July 25, 2013, Petitioner filed a motion for post-conviction DNA testing in the state circuit court, pursuant to Rule 3.853 of the Florida Rules of Criminal Procedure (Ex. I).  The circuit court denied the motion in an order rendered August 21, 2013 (Ex. J).

On October 29, 2013, Petitioner filed a motion for post-conviction relief in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. L).  On December 30, 2013, the circuit court struck the motion as facially insufficient, with leave to file an amended motion (Ex. M).  Petitioner filed an amended Rule 3.850 motion on May 5, 2014 (Ex. O).  The circuit court dismissed the amended Rule 3.850 motion as facially insufficient, without prejudice to Petitioner's filing a second amended motion within sixty days (Ex. P).  Petitioner filed a second amended Rule 3.850 motion on June 13, 2014 (Ex. Q1).  The circuit court summarily dismissed the motion with prejudice on August 21, 2014 (Ex. R).  Petitioner appealed the decision to the First DCA, Case No. 1D14-4321 (Exs. S, T).  The First DCA affirmed per curiam without written opinion on November 12, 2014 (Ex. V). <u>Bemboe</u>

v. State, 151 So. 3d 1232 (Fla. 1st DCA 2014).  The mandate issued December 9, 2014 (*id.*).

On March 6, 2014, while the Rule 3.850 proceeding was pending, Petitioner filed another Rule 3.853 motion in the state circuit court (Ex. W).  On March 11, 2014, the circuit court struck the motion because Petitioner failed to sign it (Ex. X). Petitioner filed an amended motion on December 18, 2014 (Ex. Y).  On October 15, 2015, following a response from the State, the circuit court denied the Rule 3.853 motion (Ex. GG).  Petitioner appealed the decision to the First DCA, Case No. 1D15-5142 (Ex. HH).  The First DCA affirmed per curiam without written opinion on February 9, 2016.  Bemboe v. State, No. 1D15-5142, 2016 WL 510139, at *1 (Fla. 1st DCA Feb. 9, 2016).  The mandate issued March 31, 2016.

On January 23, 2015, Petitioner filed a second Rule 3.850 motion in the state circuit court (Ex. II).  The state circuit court summarily dismissed the motion as both untimely and successive (Ex. JJ).  Petitioner appealed the decision to the First DCA, Case No. 1D15-0910 (Ex. LL).  The First DCA affirmed per curiam without written opinion on May 9, 2015 (*id.*).  Bemboe v. State, 166 So. 3d 767 (Fla. 1st DCA 2015). The mandate issued June 24, 2015 (*id.*).

Petitioner filed the instant federal habeas action on April 27, 2015 (ECF No. 1

at 48). He asserts the following grounds for relief:

> Ground One: "Counsel was ineffective for entirely failing to meaningfully participate in jury voir dire and jury selection proceedings, failing to secure a fair and impartial jury for trial, rendering Petitioner without the assistance of counsel for this critical stage of the criminal proceedings, as counsel's conduct fell below that of reasonably competent counsel."

> Ground Two: "Counsel was ineffective for failing to conduct any meaningful pre-trial investigation, failed to explore any facts relevant to the case, and failed to discover readily available exculpatory evidence in medical and law enforcement records generated in this case, rendering Defendant without the assistance of counsel for this critical stage (discovery) of the proceedings, as counsel's conduct fell below that of reasonably competent counsel."

> Ground Three: "Counsel was ineffective for entirely failing to investigate and pursue an alibi defense, and failing to secure a known, local alibi witness, rendering Petitioner without the assistance of counsel during the critical stage of the criminal proceedings."

> Ground Four: "Counsel was ineffective for entirely failing to develop and advance a defense and trial strategy, and instead remained largely idle at trial, entirely failing to subject the State's case to meaningful adversarial testing, rendering Petitioner without the assistance of counsel for trial."

> Ground Five: "Counsel was ineffective for entirely failing to make and maintain objections to the trial court's prejudicial shift from neutrality, and during such, to the admissibility of State witness testimony regarding the DNA analysis of evidence performed by FDLE, rendering Petitioner without the assistance of counsel during this critical stage of the proceeding."

<u>Ground Six</u>:  "The cumulative effect of counsel's conduct in each component of representation rendered Petitioner functionally devoid of counsel throughout these proceedings, resulting in manifest injustice."

(ECF No. 1 at 19–47).

II.    ANALYSIS

A.    <u>Timeliness Calculation</u>

Pursuant to the requirements set forth in 28 U.S.C. § 2244, a one-year period of limitation applies to the filing of a habeas petition by a person in custody pursuant to a state court judgment.  The limitation period runs from the latest of:

(A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C)  the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

The parties agree that the appropriate statutory trigger for the federal limitations period in this case is the finality date of the judgment of conviction, pursuant to

§ 2244(d)(1)(A) (*see* ECF No. 1 at 18; ECF No. 20 at 10).  Under federal law, the judgment becomes final for purposes of § 2244(d)(1)(A) upon expiration of the 90-day period in which a defendant may seek direct review of his conviction in the United States Supreme Court.  The 90-day period runs from the date of entry of the judgment sought to be reviewed.  *See* Chavers v. Sec'y, Fla. Dep't of Corr., 468 F.3d 1273, 1275 (11th Cir. 2006).  Federal Rule of Civil Procedure 6(a) provides that "[i]n computing any period of time prescribed or allowed by . . . any applicable statute, the day of the act, event or default from which the designated period of time begins to run shall not be included."  Fed. R. Civ. P. 6(a); *see also* Washington v. United States, 243 F.3d 1299, 1301 (11th Cir. 2001) (Rule 6 applies to calculation of one-year statute of limitations under AEDPA).

Here, the 90-day period for seeking certiorari review was triggered by the First DCA's affirmance of Petitioner's conviction, on December 7, 2012, and it expired 90 days later, on March 7, 2013.  Therefore, the statute of limitations began to run on March 8, 2013, the day after the 90-day period for Petitioner to file a petition for review in the United States Supreme Court expired.  Petitioner had one year from that date, or until March 8, 2014, to file his § 2254 petition.  *See* Downs v. McNeil, 520 F.3d 1311, 1318 (11th Cir. 2008) (limitations period should be calculated according to "anniversary method," under which limitations period expires on anniversary of

date it began to run) (citing <u>Ferreira v. Dep't of Corr.</u>, 494 F.3d 1286, 1289 n.1 (11th

Cir. 2007)).  Petitioner did not file his federal petition on or before March 8, 2014;

therefore, it is untimely unless tolling principles apply and render it timely, or

Petitioner demonstrates he is entitled to review of his claims through a recognized

exception to the time bar.

Section 2244(d)(2) provides:

> The time during which a properly filed application for State post-
> conviction or other collateral review with respect to the pertinent
> judgment or claim is pending shall not be counted toward any period of
> limitation under this subsection.

28 U.S.C. § 2244(d)(2).

In this case, Petitioner filed a Rule 3.853 motion for post-conviction DNA

testing on July 25, 2013.  However, Respondent correctly argues that the Eleventh

Circuit has held that a Rule 3.853 motion is not a tolling motion for purposes of

§ 2244(d)(2) (*see* ECF No. 20 at 9).  *See* <u>Brown v. Sec'y for Dep't of Corr.</u>, 530 F.3d

1335, 1337–38 (11th Cir. 2008) (concluding that a DNA testing motion under Florida

criminal rule was not an application for post-conviction or other collateral review with

respect to the pertinent judgment, for purposes of AEDPA's tolling statute); *see also,*

*e.g.*, <u>Brown v. Crews</u>, No. 3:13cv64/MCR/EMT, 2014 WL 4409952, at *5 n.7 (N.D.

Fla. Sept. 8, 2014) (unpublished) (petitioner's Rule 3.853 motion did not toll federal

limitations period) (citing <u>Brown</u>); <u>Boudreaux v. Crews</u>, No. 3:12cv197/LAC/CJK,

2013 WL 1502159, at *3 (N.D. Fla. Mar. 25, 2013) (unpublished) (same), *Report and Recommendation Adopted by* 2013 WL 1502172 (N.D. Fla. Apr. 11, 2013); <u>Reighn v. McNeil</u>, No. 3:08cv505/RV/EMT, 2009 WL 3644805, at *1 (N.D. Fla. Dec. 7, 2011) (unpublished) (same).

Petitioner's next state post-conviction application was a Rule 3.850 motion filed on October 29, 2013, after **235** days of the federal limitations period had elapsed. That motion was pending until December 9, 2014, upon issuance of the First DCA's mandate affirming the lower court's decision. *See* <u>Nyland v. Moore</u>, 216 F.3d 1264, 1267 (11th Cir. 2000) (where Florida petitioner appeals trial court's denial of post-conviction application, application remains pending until issuance of the mandate by the appellate court). The federal limitations period resumed the next day, on December 10, 2014, and expired **130** days later, on April 20, 2015 (**235 days + 130 days = 365 days**).[2, 3] Petitioner's § 2254 petition, filed on April 27, 2015, was thus untimely.

---

[2] The 365th day fell on a Saturday, April 18, 2015; therefore, Petitioner had until the following Monday, April 20, 2015, to file his federal petition. *See* Fed. R. Civ. P. 6(a)(1)(C), (6)(A).

[3] Petitioner's second Rule 3.853 motion did not qualify for statutory tolling. *See* <u>Brown</u>, 530 F.3d at 1337–38. Additionally, Petitioner's second Rule 3.850 motion did not qualify for statutory tolling, because the state court dismissed it as untimely. *See* <u>Pace v. DiGuglielmo</u>, 544 U.S. 408, 413–17, 125 S. Ct. 1807, 161 L. Ed. 2d 669 (2005).

B.     "Actual Innocence" Exception to Time Bar

Petitioner argues he is entitled to review of his habeas claims through the "actual innocence" exception to the time bar (*see* ECF No. 22).

In <u>McQuiggin v. Perkins</u>, — U.S.—, 133 S. Ct. 1924, 185 L. Ed. 2d 1019 (2013), the Supreme Court held that there is an "equitable exception" to the statute of limitations set forth in § 2244(d), but only when the petitioner presents new evidence that shows it is more likely than not that no reasonable juror would have convicted him.   133 S. Ct. at 1928, 1931, 1933.   The Court cautioned that "tenable actual-innocence gateway pleas are rare:  '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of [ ] new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'"  *Id.* at 1928 (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 329, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995) and citing <u>House v. Bell</u>, 547 U.S. 518, 538, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006)).

The Supreme Court stated in <u>Schlup</u>:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

513 U.S. at 327; *see also* Rozzelle v. Sec'y, Fla. Dep't of Corr., 672 F.3d 1000, 1011 (11th Cir. 2012) (quoting Schlup, 513 U.S. at 324, 327).  The Supreme Court has explained that "'actual innocence' means factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998).

Petitioner's "new evidence" of his actual innocence is the following: (1) evidence that the medical staff at the Santa Rosa Medical Center ("SRMC") did not find any trace of spermatozoa on the vaginal or cervical swabs collected from the victim during a sexual assault examination, (2) evidence of a nine-day delay between the time the Santa Rosa County Sheriff's Office ("SRSO") sent the sexual assault kit to the Florida Department of Law Enforcement ("FDLE") for DNA testing, (3) evidence that the SRSO sent hair collected from the victim to the FDLE for DNA analysis, but the FDLE did not analyze it, (4) evidence that the SRSO collected hair and toilet tissue from the crime scene, but it was not analyzed for DNA, (5) evidence that the victim and others provided the SRSO with information about potential suspects other than Petitioner, (6) evidence that a SRSO detective told the victim on April 12, 2010 that semen was found on vaginal and cervical swabs, even though the FDLE had not developed a DNA profile until May 3, 2010, (7) evidence that the DNA profile from the vaginal and cervical swabs did not match any DNA profiles in the

Combined DNA Index System ("CODIS"), even though Petitioner's DNA profile "has

been on file with law enforcement" since 1991, (8) evidence that the buccal swabs

collected from Petitioner by the SRSO were red in color, but the buccal swabs of the

perpetrator admitted at Petitioner's trial were not red in color, and (9) testimony from

Rosita Young, Petitioner's girlfriend, that she and Petitioner were together in her

apartment at the time the crimes occurred, (ECF No. 22 at 8–22).  Petitioner contends

if the jury had heard this evidence, no juror would have voted to find him guilty

beyond a reasonable doubt (*id.*).

> 1.      Evidence that the medical staff at the Santa Rosa Medical Center
> ("SRMC") did not find any trace of spermatozoa on the vaginal or
> cervical swabs collected from the victim during the sexual assault
> examination

Petitioner asserts the jury would not have convicted him if they had been aware

that the SRMC medical staff examined vaginal and cervical swabs collected from the

victim, and no spermatozoa were found, which contradicts the conclusions of the

FDLE analysts that semen and sperm fractions were found on the swabs (ECF No. 22

at 8–9, 13–14).  In support of this argument, Petitioner submitted a Sexual Assault

Information Sheet completed by SRMC staff, which states that an examination for

motile and nonmotile spermatozoa was performed on the swabs, but none were found

(ECF No. 1-1, Ex. C, Sexual Assault Information Sheet).

The trial transcript demonstrates that the jury was aware that the SRMC staff did not find evidence of sperm on the swabs.  Nurse Goldy and Dr. Sumrall, who were both members of the SRMC staff, testified that they performed the sexual assault examination of the victim (Ex. D2 at 113–40).  They both testified that Dr. Sumrall swabbed the victim's vagina and cervix, and those swabs were sent to the SRMC lab for testing for the presence of sperm (*id.* at 118).  On cross-examination of Nurse Goldy, defense counsel asked, "There was no semen found in any of the examinations done by your lab, correct?" (*id.* at 130).  Nurse Goldy answered, "To my knowledge I do not believe there was." (*id.*).  On re-direct examination, the State asked Goldy whether she had any actual knowledge of any lab results, and she admitted that she did not (*id.* at 131).  Additionally, during the prosecutor's cross-examination of Petitioner, Petitioner was asked the reason that his sperm was discovered in the victim's vagina, and he responded, "According to the hospital report they did not find no [sic] sperm." (*id.* at 290).  Therefore, evidence that the SRMC lab did not find spermatozoa on the vaginal and cervical swabs is not "new."

Further, evidence that the SRMC lab concluded that no motile and nonmotile spermatozoa were present on the swabs, is not exculpatory—in other words, it does not constitute new reliable evidence that Petitioner did not actually commit the acts which constituted the crimes.  At most, such evidence would have impeached the

testimony of two FDLE analysts, Ms. Melissa Keyser and Ms. Jennifer Halter, that they found and analyzed evidence of sperm on the vaginal and cervical swabs.

Melissa Keyser, a screening forensic technologist with the FDLE, testified that her job requires her to examine items of evidence for the possible presence of biological fluid, such as blood, semen, and saliva (Ex. D2 at 176–207).  She testified that with regard to examining swabs, she first performs a "presumptive test" by taking a small cutting from the cotton of the swab and placing a drop of "reagent," or testing liquid, on the swab.  Ms. Keyser testified that the cutting will turn a vivid purple color if semen is present.  Keyser testified that if the result of the presumptive test is positive, she then performs a "confirmatory test," which is a microscopic analysis of the evidence.  Keyser testified that she does this by placing the cotton cutting in a tube and allowing it to sit in a small amount of water for thirty minutes, which allows any biological cells that are present to release into the water.  She then places the tube in a centrifuge for five minutes, which causes all of the "cellular debris" to collect on the bottom of the tube.  Keyser testified that she removes most of the liquid from the tube and then removes a small amount of the remaining "cell pellet" from the tube and places it on a microscope slide.  Keyser testified that after the matter on the slide dries, she stains it with bright pink staining, which causes nuclear material, such as sperm heads and nuclei of epithelial (skin) cells to turn bright pink.  Keyser testified that she

then "counterstains" with green, which stains sperm cells and the outside of any skin cells green.  She then seals and covers the slide and examines it under a microscope. Keyser testified that under a microscope, sperm heads look like an acorn, with a clear top and a bright pink body, while skin cells appear green, large, and globular.

Ms. Keyser testified that she examined the vaginal and cervical swabs from the sexual assault kit collected from the victim and submitted to the FDLE by Jennifer Fuqua (an employee of the SRSO) on January 28, 2010 (Ex. D2 at 197–98).  Keyser identified State's Exhibit 15 as her report, and then testified regarding her examination of the evidence and the results of her examination (Ex. D2 at 198–204; *see also* ECF No. 1-1, Ex. E, FDLE Laboratory Report).  Keyser testified that she identified semen, blood, and amylase (a constituent in saliva) on the vaginal and cervical swabs.  She testified that she then transferred the evidence directly to the DNA analyst (Ex. D2 at 205–06).

Jennifer Halter, a crime lab analyst for the FDLE, testified that she examined the buccal, vaginal, and cervical swabs from the sexual assault kit and prepared a report on May 3, 2010, which was State's Exhibit 16 (Ex. D2 at 218–63).  Halter testified that she received the sexual assault kit from Melissa Keyser on April 2, 2010. She testified that she developed a full, complete DNA profile of the victim from the buccal swab included in the sexual assault kit.  Halter testified that she developed a

partial DNA profile, which was foreign to the victim, on the vaginal and cervical swabs (*id.* at 246–47).[4]  Ms. Halter testified that there was only a "sperm fraction" with "not a whole lot of sperm cells" on the vaginal and cervical swabs (Ex. D2 at 260–62; *see also* ECF No. 1-1, Ex. F, FDLE Laboratory Report).  Ms. Halter testified that the partial foreign DNA profile from the sperm on the vaginal swab was consistent with the partial foreign DNA profile from the sperm on the cervical swab, and this foreign profile was consistent with coming from a male (Ex. D2 at 260–62).  Ms. Halter testified that she examined a buccal swab from Petitioner, which was submitted to her by the SRSO on July 7, 2010.  She testified that she obtained a complete DNA profile from Petitioner's swab (*id.* at 248, 251–52).  Ms. Halter testified that she compared Petitioner's DNA profile with the partial DNA profile of the foreign donor of the DNA found on the vaginal and cervical swabs, and prepared a report on July 12, 2010, which was State's Exhibit 17 (Ex. D2 at 252–58, ECF No. 1-1, Ex. H, FDLE Laboratory Report).  Ms. Halter testified regarding population frequency statistics of her comparisons of Petitioner's DNA profile and the foreign DNA profile on the vaginal and cervical swabs (Ex. D2 at 260–63).  She testified that with regard to the vaginal swab, the combined frequency of occurrence of the DNA

---

[4] Throughout her testimony, Ms. Halter referred to the cervical swab as the "unmarked" swab.

profile from the sperm fraction for unrelated individuals was one in 29 billion in the

Caucasian population, one in 5.2 billion in the African American population, and one

in 7 billion in the Southeastern Hispanic population (*id.* at 260).  With regard to the

cervical swab, Ms. Halter testified that the combined frequency of occurrence of the

DNA profile from the sperm fraction for unrelated individuals was one in 1.8 million

in the Caucasian population, one in 1.2 million in the African American population,

and one in 720,000 in the Southeastern Hispanic population (*id.* at 261).  Ms. Halter

testified that she returned the sexual assault kit to the SRSO on May 13, 2010 (*id.* at

248).

      As previously discussed, evidence that the SRMC lab examined the vaginal and

cervical swabs and determined that no motile and nonmotile spermatozoa were

present, does not constitute new reliable evidence that the Petitioner did not actually

commit the acts which constituted the crimes.  At most, such evidence would have

impeached the testimony of Ms. Keyser and Ms. Halter, that they found and analyzed

evidence of sperm on the vaginal and cervical swabs.  However, Petitioner has not

shown that the impeachment value was such that no reasonable juror would have

convicted him had evidence of the SRMC's examination been presented. Petitioner

has proffered no evidence of the specifics of the SRMC's examination, for example,

the qualifications of the person who performed the examination and the type of

examination that was performed.  In the absence of any such evidence, Petitioner has failed to show that no reasonable juror would have convicted him if the jury had heard evidence regarding the SRMC lab's initial examination of the vaginal and cervical swabs.  *See* Scarlett v. Sec'y, Dep't of Corr., 404 F. App'x 394, 401 (11th Cir. 2010) (unpublished but recognized for persuasive authority) (dismissing habeas petition as untimely, upon determining that petitioner's DNA evidence, though not particularly inculpatory, was not exculpatory, and thus insufficient to make a colorable showing of actual innocence).

> 2.    Evidence of a nine-day delay between the time the SRSO sent the sexual assault kit to the FDLE for DNA analysis, and the time the FDLE received it

Petitioner asserts Deputy Jason Zohn stated in his offense report that he collected the sexual assault kit from the SRMC on January 19, 2010, and it was sent to the FDLE on that date; however, the FDLE did not actually receive it until nine days later, on January 28, 2010 (*see* ECF No. 1-1, Ex. A, SRSO Offense Report, Ex. E, FDLE Laboratory Report).  Petitioner contends this evidence suggests that the SRSO tampered with the sexual assault kit.

Jennifer Fuqua, the custodian of records for the SRSO, testified at trial that she is responsible for intake of evidence, storing it, keeping a record of the chain of custody, and transporting it to and from the FDLE lab (Ex. D2 at 97–98).  Ms. Fuqua

testified that the sexual assault kit was entered into the SRSO evidence room on January 19, 2010, and she delivered it to the FDLE on January 28, 2010 (*id.* at 109–10).  On cross-examination, defense counsel questioned Ms. Fuqua about the 9-day delay between the date the sexual assault kit was received by the SRSO and the date it was delivered to the FDLE (*id.* at 110–11).  Counsel asked whether anyone opened the sexual assault kit during that time, and Ms. Fuqua answered no (*id.* at 111).  Since the jury heard evidence of the delay and convicted Petitioner regardless, the evidence is not "new," nor does it colorably show Petitioner's actual innocence.

     3.    <u>Evidence that the SRSO sent hair collected from the victim to the FDLE for analysis, but no DNA analysis was performed</u>

     4.    <u>Evidence that the SRSO collected hair and toilet tissue from the crime scene, but it was not analyzed for DNA</u>

As additional new evidence of his actual innocence, Petitioner asserts that pubic hair combings from the victim were sent to the FDLE for DNA analysis, but it was not analyzed (ECF No. 22 at 9–10).  Petitioner alleges the SRSO also collected hair and toilet tissue from the crime scene, but did not submit either item to the FDLE for DNA analysis (*id.* at 10; *see also* ECF No. 1-1, Ex. B, SRSO Evidence/Property Receipt).  Petitioner asserts the State failed to provide a reason for not analyzing the hair and toilet tissue (ECF No. 22 at 9–10).

Melissa Keyser from the FDLE testified that she identified one pubic hair from the hair collected in the sexual assault kit as suitable for DNA analysis, and then transferred it to a DNA analyst (Ex. D2 at 204–06).  Jennifer Halter, the DNA analyst who analyzed the evidence from the sexual assault kit, indicated in her report that she received the hair sample but did not perform any DNA analysis on it (*see* ECF No. 1-1, Ex. F, FDLE Laboratory Report).  Halter's report was admitted into evidence at trial (*see* D2 at 246; ECF No. 1-1, Ex. F, FDLE Laboratory Report).  The fact that the pubic hair was not analyzed was thus known to the jury.

Evidence that hair and toilet tissue from the crime scene were not analyzed for DNA is not exculpatory, nor does it suggest in any way that Petitioner did not engage in the acts which constituted the crimes.  Therefore, evidence that analysis of these items did not occur does not support a colorable showing of Petitioner's actual innocence.

5.    Evidence that the victim and others provided the SRSO with information about potential suspects other than Petitioner

Petitioner contends the jury would not have convicted him if the jury had heard evidence that the victim and others provided the SRSO with information about potential suspects other than Petitioner.  For example, Petitioner alleges the victim informed law enforcement that the perpetrator's voice sounded familiar, and may have been that of her "lawn man" named "Hollywood" (ECF No. 22 at 10).  Petitioner

submitted a copy of the SRSO offense report as evidence that the victim reported her lawn man as the possible perpetrator (*see* ECF No. 1-1, Ex. A, SRSO Offense Report).

However, the Offense Report does not support Petitioner's assertions. The Report states that on January 19, 2010, the date the offenses occurred, the victim told law enforcement that the only black male that had been on her property was the man who mowed her lawn, but she stated that "she knew that the suspect was <u>not</u> the person who mowed her lawn" (*id.*, Offense Report, p.7 (emphasis added)). The Offense Report states that three months later, on April 20, 2010, the victim told law enforcement that she was told that her "yard man," Sam, stated that he heard Kevin Bembo (Petitioner) bragging that he committed the sexual assaults (*id.*, p. 11). Neither of the victim's statements involving her "lawn man" suggests that he was the perpetrator.

Petitioner alleges the victim also informed law enforcement that approximately four months after the crimes, she received a telephone call from a man whose voice was familiar and possibly the perpetrator's (ECF No. 22 at 11). Petitioner alleges law enforcement investigated the call and traced its origin to a home owned by Mrs. Eddie Mae Boykins (*id.*). Petitioner alleges he does not know Ms. Boykins, nor did he use her telephone (*id.*).

Evidence of the telephone call is not "new."  At trial, the jury heard the victim's testimony that in May of 2010, she received a telephone call from a voice that was similar to the perpetrator's, and she reported this information to law enforcement (Ex. D2 at 90–91).  The victim testified that law enforcement investigated the telephone call and identified the person to whom the telephone number belonged, but law enforcement was unable to identify the actual caller (*id.*).

Although the SRSO Offense report provides additional facts regarding law enforcement's investigation of the telephone call, none of those facts suggest Petitioner's innocence.  The report states that the person and address associated with the telephone number from which the call originated was Eddie Mae Boykins, who resided at 6830 Roundup Lane (ECF No. 1-1, Ex. A, Offense Report pp. 13, 15).  Mrs. Boykins told law enforcement that the only other persons who resided at the home were her granddaughter and her two grandsons, Tevin Wadsworth (who was 16 years old at the time), and Keshawn Stover (who was 12 years old) (*id.* at 15).  Tevin Wadsworth provided a buccal swab to law enforcement, and the swab was submitted to the FDLE for DNA analysis (*see id.*).  The FDLE developed a DNA profile which did not match the foreign profile developed from the sexual assault kit (*see* ECF No. 1-1, Ex. G, FDLE Laboratory Report).

At Petitioner's trial, Trevor Seifert, a crime lab analyst in the biology section of the FDLE, testified that he received seven buccal swab samples from the SRSO and developed DNA profiles from them (Ex. D2 at 264–67). Mr. Seifert testified that he compared each profile with the foreign DNA profile developed from the vaginal and cervical swabs from the sexual assault kit, and determined that none of the seven profiles matched the profile from the vaginal and cervical swabs (*id.*). Mr. Seifert's report was admitted into evidence at trial as State's Exhibit 18 (*id.*). The report identified the sample donors as Samuel C. Johns, Brett J. Daywalt, Cedrick C. Cunningham, Johnny W. Johnson, <u>Tevin D. Wadsworth</u>, Skyline R. McClure, and Daniel J. Fowler (ECF No. 1-1, Ex. G, FDLE Laboratory Report (emphasis added)).

Evidence of the telephone call and law enforcement's investigation of the call does not exculpate Petitioner or otherwise suggest that he did not commit the offenses. Therefore, it does not contribute to a colorable showing of actual innocence.

Petitioner additionally alleges that a co-worker of one of the victim's relatives informed law enforcement that the perpetrator may have been her uncle, Henry Blocker (ECF No. 22 at 10–11). Petitioner alleges Mr. Blocker refused law enforcement's request to provide a DNA sample (*id.* at 11). As with the evidence of other potential suspects provided to law enforcement, evidence that Henry Blocker was a potential suspect does not exculpate Petitioner or otherwise suggest he is

actually innocent of the offenses.  Therefore, this "new evidence" does not contribute to a colorable showing of actual innocence.

> ### 6.   Evidence that a detective told the victim on April 12, 2010 that semen was found on vaginal and cervical swabs, even though the FDLE did not develop a DNA profile until May 3, 2010

Petitioner alleges Detective Spratt informed the victim during the week of April 12, 2010, that the FDLE had found sperm on the swabs in the sexual assault kit, even though the FDLE did not develop a partial DNA profile from the sexual assault kit until May 3, 2010 (ECF No. 22 at 11).  Petitioner questions how Detective Spratt could have known that there was sufficient evidence of semen to produce a DNA profile prior to FDLE's conducting the DNA analysis, and he suggests that this constitutes evidence of police misconduct.

As previously discussed, Melissa Keyser testified that she examined the evidence from the sexual assault kit, which the SRSO submitted to the FDLE on January 28, 2010 (Ex. D2 at 197–98).  Ms. Keyser testified that she identified semen, blood, and amylase on the vaginal and cervical swabs, and forwarded the evidence to a DNA analyst for analysis (Ex. D2 at 198–204).  Ms. Keyser testified that she reported this information to the SRSO on March 11, 2010 (Ex. D2 at 198–204; ECF No. 1-1, Ex. E, FDLE Laboratory Report).

This evidence refutes Petitioner's contention that Detective Spratt's telephone call to the victim pre-dated the SRSO's knowledge that the FDLE had identified semen on the evidence in the sexual assault, and was performing DNA analysis. Therefore, evidence of Detective Spratt's telephone call does not suggest police misconduct or Petitioner's actual innocence.

> 7.    Evidence that the DNA profile from the vaginal and cervical swabs did not match any DNA profiles in the Combined DNA Index System ("CODIS"), even though Petitioner's profile "has been on file with law enforcement" since 1991

Petitioner asserts that no reasonable juror would have convicted him if the jury had known that his DNA profile had been "on file with law enforcement" since 1991, but that no DNA match was found when FDLE entered the foreign DNA profile from the victim's vaginal and cervical swabs into CODIS in May of 2010 (ECF No. 22 at 11, 21).

CODIS is the Federal Bureau of Investigation's Combined DNA Index System. *See* 42 U.S.C. § 14132; *see also* <u>Maryland v. King</u>, — U.S. —, 133 S. Ct. 1958, 1968, 186 L. Ed. 2d 1 (2013). The federal law authorizing the FBI to establish and maintain CODIS, i.e., the DNA Identification Act, was not enacted until 1994. *See* 42 U.S.C. § 14132 (enacted Sept. 13, 1994); *see also* <u>King</u>, *supra*. CODIS was not officially activated to allow participating state laboratories to compare DNA profiles until October of 1998. *See* <u>Tolbert v. State</u>, 114 So. 3d 291, 293 n.2 (Fla. 4th DCA 2013).

Even if Petitioner's DNA profile had been "on file" with State or local law enforcement since 1991, Petitioner has not shown that his DNA profile was entered into CODIS in 1991 (indeed it was impossible for his DNA profile to have been entered into CODIS in 1991, since CODIS was not established until 1994) or at any time prior to 2010.  Therefore, Petitioner's assertion does not support his claim of actual innocence.

> ### 8.   Evidence that the buccal swabs collected from Petitioner by the SRSO were red in color, but the buccal swabs of the perpetrator admitted at Petitioner's trial were not red in color

Petitioner asserts that the buccal swabs sent to the FDLE and identified as having been collected from him, were not the buccal swabs he provided to the SRSO (ECF No. 22 at 12, 21).  As proof of this assertion, Petitioner asserts that the FDLE report of the analysis of the swabs identified as his, does not include any indication that the buccal swabs appeared red in color (*id.*).  Petitioner asserts that when Detective Spratt collected Petitioner's buccal swabs, the swabs turned red in color, because Petitioner had just finished consuming a glass of Kool-Aid (*id.*).  Petitioner further asserts that Detective Spratt did not seal, package, or label the swabs in an "industry correct" envelope in Petitioner's presence, or otherwise follow standard protocol for the collection of such evidence (*id.*).  Petitioner contends law enforcement tampered with, mishandled, or misplaced his buccal swabs (*id.*).  He alleges that if a

new sample had been collected from him, tested, and compared to the foreign DNA profile from the sexual assault kit, he would not have been convicted (*id.*).

Petitioner has not proffered any evidence that, even if the swabs were red when they were collected, they would have remained red even after the FDLE performed its DNA analysis.  Further, the jury heard evidence of the chain of custody of Petitioner's buccal swabs (Ex. D2 at 103, 155, 170–73).  Moreover, Petitioner had the opportunity, during his trial testimony, to tell the jury that his buccal swabs were red when Detective Spratt collected them.  Thus the timing of Petitioner's assertion of this "new evidence" of the color of his buccal swab casts doubt upon its reliability.  *See* McQuiggin, 133 S. Ct. at 1935 (unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing of actual innocence) (citing Schlup, 513 U.S. at 332 ("A court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reliability of . . . evidence [of actual innocence].")).

Petitioner failed to demonstrate that no reasonable jury would have convicted him if the jury known that the buccal swabs were red from Kool-Aid when law enforcement collected them.  Therefore, such evidence does not support a colorable showing of actual innocence.

> 9.    Testimony from Rosita Young, Petitioner's girlfriend, that she and Petitioner were together in her apartment at the time the crimes occurred

Petitioner alleges that on the evening of the crimes, January 18–19, 2010, he was with his girlfriend, Rosita Young, at the apartment they shared (ECF No. 22 at 16–17).  Petitioner alleges Ms. Young was available to testify at his trial, and would have testified that she and Petitioner were at their apartment, uninterrupted, on that evening (*id.*).  Petitioner's contends this evidence would have cast reasonable doubt on the State's version of events (*id.*).

Petitioner has not proffered any evidence, let alone trustworthy evidence, that Rosita Young would have testified that Petitioner was at her apartment during the time that the crimes were committed in this case.  Indeed, Petitioner has proffered no reliable evidence of what Ms. Young would have said on the stand if she had testified at his trial.  In the absence of any such evidence, Petitioner cannot satisfy the "actual innocence" exception.

III.    CONCLUSION

Petitioner did not file his § 2254 petition within the one-year period of statute of limitations; therefore, it is untimely.  Additionally, he has not made a colorable showing of actual innocence, because he has not supported his "actual innocence" argument with any new reliable evidence showing that he did not commit the acts that constituted the burglary and sexual batterys.  Therefore, he has failed to show he is

entitled to review of his federal habeas claims through the "actual innocence" exception to the time bar.  Accordingly, his § 2254 petition should be dismissed.

## IV.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." Rule 11(a), Rules Governing Section 2254 Cases.  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.  Rule 11(a) additionally provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Rule 11(a), Rules Governing Section 2254 Cases.  If there is an objection to this recommendation by either party, that party may

bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That Respondent's motion to dismiss (ECF No. 20) be **GRANTED**.

2.      That the habeas petition (ECF No. 1) be **DISMISSED** with prejudice as untimely.

3.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 28<u>th</u> day of April 2016.


<u>/s/ *Elizabeth M. Timothy*  </u>
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


**<u>NOTICE TO THE PARTIES</u>**

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court=s order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**